UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

2017 AUG -1  P 4: 55

MARY BOATNER, *individually and on*          *          CASE NO.:
*behalf of all those similarly situated*      DEBRA P. HACKETT, CLK
                                              U.S. DISTRICT COURT   2:17-cv-519
           Plaintiff,                         MIDDLE DIST. ALA.     JURY TRIAL DEMANDED
v.                                            *
                                              *
FORD MOTOR COMPANY,                           *
                                              *
           Defendant.                         *

## CLASS ACTION COMPLAINT

Plaintiff Mary Boatner, individually and on behalf of all others similarly situated, brings

this action against defendant, Ford Motor Company and, to the best of her knowledge, information

and belief, formed after an inquiry reasonable under the circumstances, alleges as follows:

### NATURE OF THE ACTION

1.      This case arises from Ford's sale and lease of hundreds of thousands of Explorers

model vehicles, and other similar vehicles, that Ford knew or should have known are dangerous

and defective such that exhaust and other gases, including lethal quantities of carbon monoxide,

may enter the passenger compartments of the vehicles. The potential exposure to carbon monoxide

renders these vehicles unsafe to drive.

2.      Ford's Technical Service Bulletin 12-12-4 titled "Explorer Exhaust Odor in

Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor

in the vehicle with the auxiliary climate control system on. Customers may indicate the odor

smells like sulfur." Ford's TSB 12-12-4 provides instructions that Ford claims will correct the

exhaust odor in 2011 through 2013 model year Ford Explorers.

1

3. Subsequent to TSB 12-12-4, Ford issued Technical Service Bulletin 14-0130 ("TSB 14-0130").

4. Titled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles, and adds the 2014 and 2015 model year Explorers to the list of affected vehicles. TSB 14-0130 includes the same or similar service procedures outlined in TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4.

5. Ford's TSBs 12-12-4 and 14-0130, however, do not correct the condition, and they fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles. Ford's TSBs 12-12-4 and 14-0130 are provided to authorized dealerships, and do not directly notify non-Ford automotive repair facilities about the defects associated with TSBs 12-12-4 and 14-0130. Further, although Ford has received numerous complaints relating to exhaust entering the passenger compartments of 2016 through 2017 model year Ford Explorers, and it developed a purported fix to the problem, Ford provided no notice to Plaintiff or the proposed class members about the defect and the potential exposure to lethal carbon monoxide in 2016 through present model year Ford Explorers.

6. Upon information and belief, Ford sold or leased hundreds of thousands of defective vehicles nationwide. Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment during the normal and customary use of such vehicles.

7. Ford designed, manufactured, sold and leased the 2016 through present model year Ford Explorers when it knew or should have known of such defects, or Ford otherwise learned of such defects and failed to notify Plaintiff and the proposed class members of the defect in the 2016

2

through present model year Ford Explorers that exposed Plaintiff, the proposed class members, and others, to a life safety hazard.

8.     In addition, Ford has discovered that its model years 2007-2014 Edge and 2007-2015 MKX vehicles exhibit the same condition for the same reason as the Explorer. Ford has prepared, though has not released, TSBs that describe the exhaust problem with these vehicles. Jointly the 2007-2014 Edge's, 2007-2015 MKX's, and 2016-present Explorer's are referred as "Affected Vehicles" hereafter.

9.     Plaintiff and the members of the proposed classes reasonably expect to operate their Ford vehicles in a normal and customary manner free from exposure to potentially deadly gases.

## JURISDICTION AND VENUE

10.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the class is diverse from Ford.

11.     The Court has personal jurisdiction over Ford because Ford conducts substantial business in this District, and some of the actions giving rise to this complaint took place in this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391(a) because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this District, and caused harm to class members residing in this District.

## PARTIES

13.     Plaintiff Mary Boatner is a citizen of Elmore County, Alabama over nineteen years of age and lives and resides within this judicial district.

3

14.     Defendant Ford Motor Company, is a Delaware corporation with its principal place of business in Michigan. Ford is a citizen of the state of Michigan. In this Complaint, "Ford" refers to the named defendant and all related, successor, predecessor, parent and subsidiary entities to which these allegations pertain.

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

15.     Mary Boatner purchased a 2017 Ford Explorer from Collier Ford in Wetumpka, Alabama in 2017.The vehicle, VIN 1FM5K7D80HGC99285 was purchased by Ms. Boatner on July 3, 2017.

16.     The 2017 Ford Explorer purchased by Plaintiff was dangerous and defective when purchased because its design and exhaust and/or HVAC systems permitted an exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the vehicle. The defect is latent in nature because it is not obvious or ascertainable upon reasonable examination or inspection.

17.     At the time of the purchase, Plaintiff was not notified that the 2017 Ford Explorer she purchased was defective, nor was she notified that she and all occupants, including her husband and grandchildren, would be exposed to lethal carbon monoxide and other potentially dangerous gases while driving in her 2017 Ford Explorer during its normal and customary use.

18.     On July 6, 2017 Plaintiff Mary Boatner drove her vehicle from Tallassee, Alabama to Sterling Heights, Michigan to visit her sister. Shortly after she began her fourteen (14) hour trip, she noticed a strong chemical odor. Ms. Boatner rolled down her windows for fresh air, however, the odor would not subside.

4

19.     When Ms. Boatner arrived in Michigan, and for several days thereafter, she experienced a general altered mental status, including, restlessness and lack of focus, fatigue nausea and headaches.

20.     On July 12, 2017, Ms. Boatner learned that 2011-2015 versions of her 2017 Ford Explorers suffered carbon monoxide intrusion and took her Ford Explorer to Brighton Ford. She requested the Ford dealership check for a carbon monoxide leak and repair as needed.

21.     Brighton Ford refused to accept Ms. Boatner for repair but did provide Ms. Boatner with a Ford document detailing steps for repairing cabin exhaust leaks in 2016-2017 Explorers.

22.     By July 13, 2017 Ms. Boatner's symptoms had not subsided and she was admitted to Henry Ford Hospital in Clinton Township, Michigan for three (3) days. Ms. Boatner underwent several medical tests and was informed that her carbon monoxide levels were "high normal."

23.     To date, Ford has not repaired Plaintiff's 2017 Ford Explorer, nor has Ford acknowledged to Plaintiff or the members of the proposed class that the 2016 through present model year Ford Explorers contain design flaws and/or defective exhaust and/or HVAC systems permitting lethal carbon monoxide and other potentially dangerous gases into the passenger compartments of those vehicles.

24.     To date, Plaintiff Mary Boatner continues to suffer from headaches as a result of her exposure to carbon monoxide while driving in her 2017 Ford Explorer.

## GENERAL ALLEGATIONS

### A. **Ford Sold and Leased Dangerous and Defective Vehicles**

25.     Ford began selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer.

26.     The subsequent model year Ford Explorers are not dramatically different in design from the 2011 model year Ford Explorer, and the Explorers sold today are considered part of the "fifth generation" of Ford Explorer vehicles.

27.     The 2016 through present model year Ford Explorers and other Affected Vehicles were designed, engineered and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC systems that permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner.

28.     Ford designed, manufactured, assembled, inspected, distributed, sold and leased the Affected Vehicles in a manner so as to render the Affected Vehicles defective and unsafe for their intended use and purpose by, among other things:

> (a) Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;
>
> (b) Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;
>
> (c) Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;
>
> (d) Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;
>
> (e) Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;
>
> (f) Designing, manufacturing and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles; and,

6

(g) Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

29.     Ford knew or should have known that the Affected Vehicles were dangerous and defective such that drivers and passengers of those vehicles may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

30.     The defective vehicles were sold or leased pursuant to express and implied warranties. These warranties assured consumers that the vehicles were free from defects and were properly equipped for the use for which they were intended. At the time the defective vehicles were sold or leased by Ford directly and through its authorized agents, the vehicles were in violation of express and implied warranties. All of the defective vehicles are still within the dates of the express written warranties, or the time or mileage limits in the express warranties should be inapplicable given Ford's fraudulent conduct, among other things.

31.     In promoting, selling and repairing its defective vehicles, Ford acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Ford representatives and agents. That the dealers act as Ford's agents is demonstrated by the fact that: (i) the warranties provided by Ford for the defective vehicles directs consumers to take their vehicles to authorized dealerships for repairs or services; (ii) Ford dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers; (iii) Ford directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective vehicles; and (iv) Ford has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public.

7

32.     Ford's control over the actions of its dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the defects alleged herein. Authorized Ford dealerships are instructed by Ford to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130 to model years excluding the 2016-2017 Ford Explorers.

## B. Ford Acknowledged the Affected Vehicles' Defective Condition in TSBs 12-12-4 and 14-0130

33.     In response to customer complaints of an exhaust odor in the passenger compartments of the Affected Vehicles, Ford issued TSB 12-12-4 in or about December 2012. TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

34.     In or about July 2014, Ford issued TSB 14-0130, which added 2014 and 2015 model year Explorers to the list of affected vehicles.  TSB 14-0130 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

35.     Despite issuing TSBs 12-12-4 and 14-0130, Ford did not inform Plaintiff or the members of the proposed class of the defects in 2016 through present model year Ford Explorers, despite the fact that those defects presented life safety issues to occupants of the vehicles.

36.     Notably, TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor acknowledged therein is accompanied in the passenger compartment by lethal carbon monoxide.

37.     At all material times, Ford has failed to inform customers who purchased and/or leased Affected Vehicles that they are unsafe for operation or that they were designed, engineered

8

and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles.

38.     In addition, TSBs 12-12-4 and 14-0130 do not identify a specific fix to the exhaust odor problem. Rather, TSBs 12-12-4 and 14-0130 require various replacements and/or repairs to several unrelated vehicle parts. This demonstrates that Ford knew of the defect, but did not know of a specific, effective fix to protect occupants of the Affected Vehicles from exhaust and other gases, including carbon monoxide. Based upon information and belief, Ford issued TSBs 12-12-4 and 14-0130 *hoping*, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints.

## C. Ford's TSBs 12-12-4 and 14-0130 Fail to Repair the Defects

39.     Ford's TSBs 12-12-4 and 14-0130 fail to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases, including carbon monoxide, enter the passenger compartment.

40.     TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2016 through 2017 model year Ford Explorer and other Affected Vehicles, and prescribe repairs and/or replacements which are inadequate and equally flawed and defective.

41.     In TSBs 12-12-4 and 14-0130, Ford requires installation or use of the following replacement parts in the Affected Vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSB 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft® Seam sealer (part number TA-2).

42.     TSBs 12-12-4 and 14-0130 requires that the dual rate air extractor replace the driver side rear air extractor initially installed on the Affected Vehicle. The rear air extractor initially

9

installed on the Affected Vehicle was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the Affected Vehicles and enter the passenger compartment.   Based upon information and belief, Ford requires the replacement of the driver side rear air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air condition system is situated dangerously close in proximity to the driver side rear air extractor.   The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system.

43.     The replacement part – a dual rate air extractor – is formed of polypropylene and overmolded with thermoplastic elastomer (TPE).   The dual rate air extractor includes "living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve.

44.     The dual rate air extractor has a listed purchase price of $86.33, whereas the initially installed air extractor has a listed purchase price of $22.50.   However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartments of the Affected Vehicles.   The replacement dual rate air extractors are therefore ineffective, dangerous and defective.

45.     In addition, Ford modifies the dual rate air extractors used as replacement parts per TSBs 12-12-4 and 14-0130, by haphazardly adding a silicone-like white substance to the uppermost of the three "living hinges."   Based upon information and belief, the silicone-like white substance found on replacement part number BB5Z-61280B62-A is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its manufacturer.   Moreover, the silicone-like white substance added by Ford to the dual rate air extractor causes the

10

"living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the vehicles, and enter the passenger compartment.

46.     Ford designed, manufactured and engineered the 2016 through present model year Ford Explorers and Affected Vehicles using valve assembly auto drains on the rear liftgate of the vehicles which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment. The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment, and thus, they are ineffective, dangerous and defective.

47.     Ford designed, manufactured, engineered and assembled the 2016 through present model year Ford Explorers and Affected Vehicles without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the Affected Vehicles. Ford additionally designed, manufactured, engineered and assembled the 2016 through present model year Ford Explorers and Affected Vehicles without properly sealing the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines. Accordingly, TSBs 12-12-4 and 14-0130 require that the foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized undercoating, and seam sealer. However, the rubberized undercoating and seam sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

48.     TSB 14-0130 additionally requires the reprogramming of the HVAC module to the latest calibration. Reprogramming the HVAC module, however, fails to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

49.     Ford manufactures two other brands of SUVs that exhibit the same problem. Ford has identified that model years 2011-2013 of its Edge and MKX cars, , have the same exhaust

contamination problem as does the Explorer, and for the same reasons. Furthermore, the 2007-2014 Edge and 2007-2015 MKX vehicles are built on the same or comparable platforms, have the same or comparable design, use the same or comparable components, and have the same problem, namely, exhaust in the passenger cabins.

### D. Ford's Conduct and/or Inaction Has Damaged Plaintiff and Members of the Proposed Class

50.    Plaintiff and each member of the proposed class has been damaged by Ford's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, they unknowingly purchased defective vehicles which cannot be safely operated, they have been forced to pay, or will pay, substantial amounts of money to repair the vehicles, if a repair can be made, and the value of their affected vehicles has been diminished because of this defect.

51.    A vehicle containing the defect described herein – that is, a defect that permits the entry of carbon monoxide and other gases into the passenger compartment of the vehicle – is worth less than a vehicle free from such defect.  Given that the defect renders driving the Affected Vehicles a health hazard which is potentially deadly, the vehicles are valueless.  At the time Plaintiff purchased the vehicle, she paid a price based on the value of such a vehicle free of such defect.

### CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and the members of a three proposed classes.  The requirements of Rule 23(a), (b)(2) and (b)(3) are each met with respect to the classes defined below.

53.    Plaintiff seeks to represent the following class, known here as the **Alabama Explorer Class:**

12

All persons who purchased or leased in Alabama at least one of the following vehicles: 2016 Ford Explorer or 2017 Ford Explorer.

54. In addition, Plaintiff seeks to represent the following class, known here as

the **National Magnuson-Moss Explorer Class**:

All persons who purchased or leased anywhere in the United States at least one of the following vehicles: 2016 - 2017 Ford Explorer.

55. In addition, Plaintiff seeks to represent the following class, known here as

the **National Magnuson-Moss All Model Class**:

All persons who purchased or leased anywhere in the United States at least one of the following vehicles: 2016 - 2017 Ford Explorer, 2007-2013 Ford Edge, and 2007 - 2015 Lincoln MKX.

56. **Numerosity**. Members of each of the four classes are so numerous that individual joinder of all members is impracticable. Based upon information and belief, Ford has sold tens of thousands of Affected Vehicles in Alabama. All of these vehicles exhibit the same issues outlined in TSBs 12-12-4 and 14-0130, and contain a defect that may cause carbon monoxide or exhaust to enter the passenger compartments of such vehicles.

57. **Existence of Common Questions of Law and Fact**. Common questions of law and fact exist as to all members of each of the classes. These include, but are not limited to: whether the Affected Vehicles have been sold or leased subject to express and/or implied warranties; whether each Affected Vehicle is defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles; whether the Affected Vehicles suffer from a design defect, are unreasonable dangerous and/or are unfit for their intended use; whether Ford has knowledge of such defect; when Ford learned of such defect; whether Ford failed to disclose the defect to Plaintiff and the class; whether Ford misrepresented that the affected vehicles were safe; whether Ford has a fix to the defect and, if so, how much the fix will cost; whether the defect

13

reduces the value of the affected vehicles; whether Ford's express warranties cover the latent defects; whether Ford breached its warranties made to Plaintiff and the class; whether Ford negligently designed/engineered/manufactured the affected vehicles; whether Ford concealed the defect; and whether Plaintiff and the class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.

58.    **Typicality**.  The claims of Plaintiff are typical of the claims of each of the classes, as Plaintiff and the members of each of the classes have purchased or leased defective vehicles and have been harmed in some manner by Ford's conduct.

59.    **Adequacy**.  Plaintiff will fairly and adequately protect the interests of each of the classes.  Plaintiff's interests do not conflict with the interests of the members of any of the classes.  Further, Plaintiff has retained counsel competent and experience in complex class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action.

60.    **Predominance and Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual class members is impracticable.  Questions of law and fact common to the members of each of the classes predominate over any questions affecting only individual members.  Likewise, because the damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

61.    The prosecution of separate actions by the individual class members would also create a risk of inconsistent or varying adjudications for individual class members, which would establish incompatible standards of conduct for Ford.  The conduct of this action as a class action

14

presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member. Further, Plaintiff anticipates no difficulty in the management of this litigation as a class action.

62.     For all of the foregoing reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
**(15 U.S.C. § 2301, *et seq.*)**

63.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 62 as if fully set forth herein.

64.     This Count is brought on behalf of the **National Magnuson-Moss All Model Class** and, alternatively, the **National Magnuson-Moss Explorer Class and Alabama Explorer Class**.

65.     Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

66.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

67.     The vehicles described above in the four class definitions are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

68.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by, among other things, the failure of a warrantor to comply with written or implied warranties.

69.     Ford sells and leases its vehicles subject to express warranties that are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). Ford

15

additionally sells and leases its vehicles subject to implied warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

70.     When Plaintiff and members of the class purchased and/or leased their Affected Vehicles, Ford expressly warranted that the vehicles would be free from defects in design, materials and workmanship. Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

71.     When Plaintiff and members of the classes purchased and/or leased Ford vehicles, Ford impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by owners and lessees, and were not otherwise injurious to consumers. Ford was under a duty to design, construct, manufacture, inspect and test the vehicles so as to make them suitable for the ordinary purpose of their use.

72.     The Ford vehicles described above share a common defect in that they have been designed and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartment of such vehicles during their normal and customary use. Ford is aware of the defect, and has acknowledged the problem of an exhaust odor inside the passenger compartment of such vehicles by its issuance of TSBs 12-12-4 and 14-0130. However, TSBs 12-12-4 and 14-0130 do not disclose the presence of carbon monoxide inside the passenger compartment of the Affected Vehicles, nor do they fix the problem of exhaust and other gases entering the passenger compartment. Ford has breached its express and implied warranties by failing to disclose a life safety defect in the Affected Vehicles, by failing to fix the defects in the Affected Vehicles, and by selling or leasing vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

73.     Plaintiff and each of the members of each of the classes have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on the one hand, and Plaintiff and each of the members of the classes, on the other hand. Notwithstanding, Plaintiff and each of the members of the classes are the intended beneficiaries of Ford's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Affected Vehicles, and have no rights under the warranty agreements provided by Ford. Ford's warranties were designed for and intended to benefit the consumers only.

74.     Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Ford has known, or should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the Affected Vehicles' defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such vehicles. Notwithstanding, Ford has failed to disclose the existence of this defect and the risk of carbon monoxide exposure, and has failed to rectify the situation. Plaintiff, on numerous occasions, afforded Ford an opportunity to cure by bringing her vehicle into an authorized Ford dealership for service, and notifying the dealership of an exhaust odor in the passenger compartment. Notwithstanding, the defect in Plaintiff's vehicle was not repaired. Furthermore, Ford's authorized dealership expressly represented that no carbon monoxide enters the passenger compartment of the Affected Vehicles and that the problem is limited to a non-safety related issue of odor only – a false representation. What is more, Plaintiff was specifically informed by Ford's authorized dealer that Ford knows of the problem, and does not have a means to fix the problem. Under the circumstances, any requirement that Plaintiff afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

17

75.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

76.     Plaintiff, individually and on behalf of the other class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT II

### BREACH OF EXPRESS WARRANTY
### (Ala. Code §§ 7-2-313 & 7-2A-210, *et seq.*)

77.     Plaintiff Boatner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs [1-62] as if fully set forth herein.

78.     Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

79.     Ford is and was at all relevant times a merchant with respect to the Affected Vehicles.

80.     Ford expressly warranted that the vehicles would be free from defects in design, materials and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

81.     Based upon information and belief, Ford knew that its vehicles were defective such that an exhaust odor would enter the passenger compartments of those vehicles, and Ford knew or should have known that carbon monoxide and/or other dangerous gases were entering the passenger compartments of such vehicles.

18

82.     Ford failed to disclose this defect, and has failed to notify Plaintiff and the members of the class, and dealers, of such defect and how to correct it.

83.     Ford breached its express warranty to repair defects in materials and workmanship within the Affected Vehicles. Ford has not repaired, and has been unable to repair, the Affected Vehicles' materials and workmanship defects.

84.     Ford's warranty and warranty repairs fail their essential purpose as Ford has been and may continue to be unable to repair or rectify the problem in the Affected Vehicles. Any claimed limitation on warranty rights accordingly are ineffective and unconscionable given the factual circumstances.

## COUNT III

### BREACH OF IMPLIED WARRANTIES
### (Ala. Code §§ 7-2-314; 7-2-315 & 7-2A-212; 7-2A-213 *et seq.*)

85.     Plaintiff Boatner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs [1-62] as if fully set forth herein.

86.     Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

87.     Ford is and was at all relevant times a merchant with respect to motor vehicles under Ala. Code §§ 7-2-104 and 7-2A-103.

88.     Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Affected Vehicles were in merchantable condition was implied by law, and the Affected Vehicles were bought and sold subject to an implied warranty of merchantability.

89.     Pursuant to Ala. Code §§ 7-2-315 and 7-2A-213, a warranty that Affected Vehicles were fit for their particular purpose was implied by law, and the Affected Vehicles were bought and sold subject to an implied warranty for fitness for a particular purpose.

90.     The Affected Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Affected Vehicles suffer a defect in that they have been designed and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartment of such vehicles during their normal and customary use.

91.     Plaintiff and the other Affected members suffered injuries due to the defective nature of the Class Vehicles and Ford's breach of the warranty of merchantability.

92.     As a direct and proximate result of Ford's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

93.     Ford's warranty and warranty repairs fail their essential purpose as Ford has been and may continue to be unable to repair or rectify the problem in the Affected Vehicles. Any claimed limitation on warranty rights accordingly are ineffective and unconscionable given the factual circumstances.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other class members, respectfully requests judgment against Ford:

(a)     Certifying the classes and appointing Plaintiff and her counsel to represent the classes;

20

(b)     Ordering Ford to provide notice to the classes of the defect with, among other things, the design of the Affected Vehicles, and/or the exhaust and/or HVAC systems such that carbon monoxide and exhaust gets into the passenger compartments of such Affected Vehicles during their normal and customary use;

(c)     Ordering Ford to promptly repair and/or replace, without charge, all Affected Vehicles to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartments of such vehicles; or ordering Ford to offer rescission to Plaintiff and the members of the classes by returning the full costs paid to purchase or lease the Affected Vehicles in exchange for a return of the defective vehicles;

(d)     Awarding damages which include, but are not limited to, the cost of any repairs and the diminution of value of the Affected Vehicles;

(e)     Awarding pre-judgment and post-judgment interest;

(f)     Awarding attorneys' fees and costs including those provided by statute; and

(g)     Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable.

Dated:   August 1, 2017

**W. DANIEL "DEE" MILES, III [ASB-7656-75W]**
**H. CLAY BARNETT, III [ASB-4878-N68B]**
**ANDREW E. BRASHIER[ASB-8974-A63B]**

**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104

21

Telephone: (334) 269-2343
Clay.Barnett@BeasleyAllen.com
Andrew.Brashier@BeasleyAllen.com
Dee.Miles@Beasleyallen.com

Adam J. Levitt*
Amy E. Keller*
Daniel R. Ferri*
**DICELLO LEVITT & CASEY LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
alevitt@dlcfirm.com
akeller@dlcfirm.com
dferri@dlcfirm.com

Jordan M. Lewis,*
**Jordan Lewis, P.A.**
4473 N.E. 11th Avenue
Fort Lauderdale, FL
Phone (612) 559-3660
Facsimile (954) 206-0374
jordan@jml-lawfirm.com

John J. Uustal, Esq.*
Michael A. Hersh, Esq.*
**Kelley/Uustal, PLC**
700 S.E. 3rd Ave., Suite 300
Fort Lauderdale, Florida 33316
Phone:      (954) 522-6601
Facsimile: (954) 522-6608
jju@kulaw.com
mah@kulawe.com

J. Allen Schreiber (ASB-2540-R76J)
Lauren E. Miles (ASB-3564-T63E)
SCHREIBER LAW FIRM, P.C.
6 Office Park Circle Suite 209
Birmingham, AL 35223
Phone: 22058719140
allen@schreiber.law
lauren@schreiber.law

*Counsel for Plaintiff and the Proposed Class*

\* Application for pro hac vice admission to be filed